IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs December 2, 2003

## STATE OF TENNESSEE v. FINUS RODGERS

**Appeal from the Criminal Court for Shelby County**
**No. 02-04729     Chris Craft, Judge**

---

**No. W2003-01844-CCA-R3-CD  - Filed March 30, 2004**

---

A Shelby County jury convicted the defendant, Finus Rodgers, of aggravated robbery.  Following a sentencing hearing, the trial court sentenced the defendant, as a Range I standard offender, to ten years confinement in the Department of Correction.  On appeal, the defendant argues that insufficient evidence exists in the record to support his conviction.  Our review convinces us that the evidence is legally sufficient, and we affirm the defendant's aggravated robbery conviction.

**Tenn. R. App. P. 3; Judgment of the Criminal Court is Affirmed.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which ALAN E. GLENN and ROBERT W. WEDEMEYER, JJ., joined.

Robert Wilson Jones, District Public Defender; and Robert H. Gowan and Tony N. Braxton, Assistant Public Defenders, for the Appellant, Finus Rodgers.

Paul G. Summers, Attorney General & Reporter; Kathy D. Aslinger, Assistant Attorney General; William L. Gibbons, District Attorney General; and Amy Weirich, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION

This case involves a mindless carjacking and robbery perpetrated against Narvin Gray who had befriended the defendant and secured for him a job interview with the recruiting director of the Peabody Hotel in Memphis.  The convicting evidence, viewed in the light most favorable to the state, showed that Mr. Gray met the defendant sometime in 2001.  Mr. Gray had full-time employment with the Peabody Hotel, but he also worked part time as a sales associate for a local Mapco convenience store.  The defendant frequented the Mapco store and would "hang around" and talk to Mr. Gray.  From time to time, Mr. Gray would "buy" a pack of cigarettes for the defendant, who Mr. Gray knew only as "Mario."  Also, on a couple of occasions, Mr. Gray had given the defendant a ride when the defendant had been stranded and had called for assistance.

Mr. Gray testified that the defendant confided that he was trying to change his life and needed a job. Mr. Gray spoke to the recruiting director for the Peabody Hotel and arranged a job interview for the defendant on Monday, October 30, 2001. According to Mr. Gray, the evening before the scheduled interview, the defendant called Mr. Gray's cell phone at approximately 10:00 or 10:30 p.m. The defendant asked Mr. Gray to drive to the defendant's girlfriend's house; the defendant claimed that he was stranded and complained that unless Mr. Gray drove him downtown, he would miss his job interview the next morning. Although tired, Mr. Gray drove to the girlfriend's house off of Shelby Drive. Mr. Gray stated that when he blew the car horn, the defendant walked out of the residence, got in the front passenger seat, and commented that Mr. Gray was "on Fred," meaning that the car had a full tank of gasoline.

Mr. Gray testified that the defendant then pestered him to first drive the girlfriend to her cousin's house. Mr. Gray finally acquiesced, and the three of them left. The defendant was positioned in the back seat of Mr. Gray's two-door Pontiac Grand Am, and the girlfriend, Novella Beard, was seated in the front passenger seat. Mr. Gray explained that both the defendant and Beard were giving directions where to turn, and after a time, Mr. Gray demanded to know where they were going. Mr. Gray testified that he stopped at a train crossing where a train crossed the isolated street on which they had been driving. While they waited for the train to pass, the defendant repeatedly asked Mr. Gray to get out of the vehicle to talk. Mr. Gray refused, and at trial, he explained that he did not "feel safe" getting out of the car in such an unfamiliar and isolated area.

After the train passed, Mr. Gray commenced driving. He testified that the defendant and Beard told him to stop in front of a house unknown to Mr. Gray. Beard knocked on the house door, but no one responded. Beard then returned to the car and asked to use Mr. Gray's cell phone to see if her cousin was in the house. After making a call, Beard related that her cousin was not home, at which point Mr. Gray became upset and told them, "Look, you all need to tell me where you want to go, because I've been driving around for awhile, tell me where you need to go."

The defendant then borrowed Mr. Gray's cell phone, and Mr. Gray testified that he heard the defendant tell the other person on the phone that the defendant's "buddy [was] tripping" and that the person needed to drive out and get them. After a time and when no one arrived, the defendant instructed Mr. Gray to drive them to a location near a junk yard. Mr. Gray said that he began driving but started to become "real nervous." Finally, Mr. Gray told the duo that they had to get out of his vehicle. He related that he pushed the button to unlock the car doors and began to pull over, at which time the defendant pulled a gun and demanded, "Clean out your pockets, I want all your money, I want your ATM card, I want the number and everything." Mr. Gray stopped the car, and the defendant grabbed the hood of Mr. Gray's sweatshirt, leveled the gun at the back of Mr. Gray's head, and threatened to blow Mr. Gray's brains out unless he turned over all of his money.

Mr. Gray began emptying his pockets, and Beard got out of the vehicle. Beard picked up Mr. Gray's cash and an ATM card, and she walked around to the driver's side of the car. The defendant and Beard ordered Mr. Gray to get out of the vehicle, which he did. Mr. Gray stated that the defendant also got out of the car. When the defendant started to point the gun in Mr. Gray's

-2-

direction, Mr. Gray said that he "took off running and screaming" in the direction of nearby houses. Mr. Gray testified that he turned around just long enough to see the pair drive off in his car.

Mr. Gray testified that the residents at one of the nearby houses summoned the police. The police took a statement from Mr. Gray and drove him home. Approximately one month later, the police contacted him and advised that his car had been found and was in police impoundment. Mr. Gray identified his vehicle and noted that the license tag was missing, several windows had been broken out, and the driver's side headlight had been cracked. The police did not recover any other property taken from Mr. Gray. On separate occasions, Mr. Gray identified both the defendant and Beard from photo arrays that the police had constructed.

The police arrested and jointly charged the defendant and Beard with aggravated robbery. Mr. Gray recalled that at a later time, the defendant called and wanted Mr. Gray to "drop" the charges; the defendant offered to pay Mr. Gray for his cooperation. Beard also contacted Mr. Gray and offered to pay him to "put all of [the] blame" on the defendant. Mr. Gray admitted that he had done numerous favors for the defendant, including purchasing tee-shirts and socks for him, buying him food, and paying for a motel room once when the defendant complained that he had nowhere to go. Mr. Gray, however, adamantly denied wanting or having any type of intimate physical relationship with the defendant.

Officer Essica Littlejohn testified that she responded to a carjacking report on October 29, 2001. Officer Littlejohn met with Mr. Gray around 12:15 a.m., and he gave a statement describing how he had been robbed at gunpoint and how his vehicle had been taken. After taking Mr. Gray's statement and broadcasting a description of his vehicle and the suspects, Officer Littlejohn drove Mr. Gray home.

Sergeant Deborah Kelly testified that on October 29, 2001, she was assigned to the crime response team. Mr. Gray's vehicle was towed on November 12, 2001, to a secure law enforcement warehouse where it was processed, meaning that fingerprints and other evidence were collected. Sergeant Kelly explained that she was involved in examining Mr. Gray's vehicle on November 13 and "dusting" it for fingerprints. Sergeant Kelly identified fingerprint cards generated from fingerprints recovered from Mr. Gray's vehicle.

Officer Nathan Gathright testified for the state as an expert latent fingerprint examiner. He testified that latent fingerprints recovered from Mr. Gray's vehicle had sufficient detail to make a positive identification of Novella Beard.

Neither the defendant nor co-defendant Beard testified or offered any evidence or other witnesses. Based on the evidence before it, the jury found the defendant and Beard guilty of aggravated robbery.

The defendant appeals from his conviction and claims that the evidence was insufficient to support his conviction. Specifically, he argues that his conviction is improperly based

solely upon the uncorroborated testimony of the victim, Narvin Gray. The state insists that the evidence is overwhelmingly sufficient to prove the defendant's guilt of aggravated robbery. We agree with the state.

Our standard of review is highly deferential, permitting reversal only if no rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt; we canvass the evidence in the light most favorable to the prosecution. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781 (1979); *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003). The weight and credibility of the witnesses' testimony are matters entrusted exclusively to the jury as the factfinder. *State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984); *State v. Brewer*, 932 S.W.2d 1, 19 (Tenn. Crim. App. 1996).

Robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a) (2003). Robbery then is classified as "aggravated" if it is "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." *Id*. § 39-13-402(a)(1) (2003). A jury hearing the evidence in this case reasonably could conclude that, at the defendant's behest, the victim was chauffeuring the defendant and Beard to unknown destinations. The victim grew nervous and impatient, and when he told his passengers that they must get out of his vehicle, the defendant pulled out a gun, demanded that the victim clean out his pockets and turn over all his money and ATM card. From the victim's testimony, a reasonable jury could also conclude that when the victim stopped the vehicle, the defendant grabbed the hood of the victim's sweatshirt, leveled a gun at the back of the victim's head, and threatened to "blow out" the victim's brains unless he surrendered his money. The victim complied and was able to escape on foot. As he was fleeing, the victim turned around long enough to see the defendant and Beard departing in the vehicle. This proof is sufficient to sustain the defendant's aggravated robbery conviction. *See State v. Anthony Leon Moore*, No. W2000-02862-CCA-R3-CD (Tenn. Crim. App., Jackson, Feb. 11, 2002) (evidence sufficient to sustain aggravated robbery conviction when defendant entered hotel room, put a handgun to the victim's head, and repeatedly threatened to kill the victim before leaving with money stolen from the victim); *State v. Mario Rogers*, No. W1999-01454-CCA-R3-CD (Tenn. Crim. App., Jackson, June 26, 2001) (evidence sufficient to support aggravated robbery conviction when victim testified that defendant pointed gun at him and demanded his money, officers found gun and cash on defendant's person, and victim identified defendant as man who robbed him).

Finally, regarding the defendant's contention that his conviction improperly rests on the uncorroborated testimony of Mr. Gray, the law is settled that no requirement exists that the testimony of a crime victim must be corroborated; a conviction based upon the victim's testimony alone is adequate to withstand an evidence sufficiency challenge. *See State v. David Earl Palmer*, No. W2001-02515-CCA-R3-CD (Tenn. Crim. App., Jackson, Dec. 13, 2002), *perm. app. denied* (Tenn. 2003); *State v. Williams*, 623 S.W.2d 118, 120 (Tenn. Crim. App. 1981); *Montgomery v. State*, 556 S.W.2d 559, 560 (Tenn. Crim. App. 1977).

Based upon the foregoing and the record as a whole, we affirm the judgment of conviction.

_____
JAMES CURWOOD WITT, JR., JUDGE